## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

| | |
|---|---|
| **BRYAN HARRELL,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) **Civil Action No.  2:24-cv-428** |
| **EQUIFAX INFORMATION SERVICES, LLC,** | ) |
| SERVE:  Corporation Service Company, Reg. Agent | ) |
|         100 Shockoe Slip | ) |
|         2nd Floor | ) |
|         Richmond, VA  23219 | ) |

**BRYAN HARRELL,**

      **Plaintiff,**

**v.**

Civil Action No.  **2:24-cv-428**

**EQUIFAX INFORMATION SERVICES, LLC,**
SERVE:  Corporation Service Company, Reg. Agent
        100 Shockoe Slip
        2nd Floor
        Richmond, VA  23219

**EXPERIAN INFORMATION SOLUTIONS, INC.,**
SERVE:  CT Corporation System, Reg. Agent
        4701 Cox Rd,
        Ste. 285
        Glen Allen, VA 23060

**TRANS UNION, LLC,**
SERVE:  Corporation Service Company, Reg. Agent
        100 Shockoe Slip
        2nd Floor
        Richmond, VA 23219

**CITIZENS BANK, N.A.,**
SERVE:  Any Officer
        One Citizens Plaza
        Providence, RI 02903

**USAA FEDERAL SAVINGS BANK,**
SERVE:  Any Officer
        520 Independence Parkway
        Chesapeake, VA 23320
and

**LVNV FUNDING, LLC,**
SERVE:  Corporation Service Company, Reg. Agent
        100 Shockoe Slip
        2nd Floor
        Richmond, VA 23219

      **Defendants.**

## COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW the Plaintiff, Bryan Harrell, by counsel, and for his Complaint against Defendants Equifax Information Services, LLC ("Equifax), Experian Information Solutions, Inc. ("Experian"), Trans Union, LLC ("Trans Union"), Citizens Bank, N.A. ("Citizens"), USAA Federal Savings Bank ("USAA") and LVNV Funding, LLC ("LVNV"), he states as follows:

### PRELIMINARY STATEMENT

1.      This is an action for statutory, actual, and punitive damages, costs, and attorney fees brought to enforce Plaintiff's civil rights pursuant to the Fair Credit Reporting Act, 15 U.S.C. §§ 1681–1681x ("FCRA").

2.      Equifax, Experian, and Trans Union are the USA's major consumer reporting agencies (hereinafter, these 3 are collectively referred to as the "CRAs" or "CRA Defendants").

3.      The Fair Credit Reporting Act provides federally codified protection of Plaintiff's civil rights with regard to Plaintiff's privacy, Plaintiff's reputation, and Plaintiff's due process rights against defamation. The Fair Credit Reporting Act is part of a larger category of consumer protection statutes designed to arm consumers against discrimination, intrusions upon privacy, and other types of unfair and inequitable treatment. Similar statutes falling under this same umbrella of protection include, for example, the Equal Credit Opportunity Act, the Fair Housing Act, and the Fair Debt Collection Practices Act.

4.      Claims under these federal protections are brought "in connection with any action involving a claim of 'unlawful discrimination'", as described in 26 U.S.C § 62(a)(20). For the purposes of 26 U.S.C § 62(a)(20), the term "unlawful discrimination" is broadly defined in 26 U.S.C § 62(e) to mean "an act that is unlawful under . . .[a]ny provision of Federal, State, or local

law, or common law claims permitted under Federal, State, or local law . . . providing for the enforcement of civil rights".

5.      The FCRA demands that CRAs utilize reasonable procedures to assure the maximum possible accuracy of the information they report. 15 U.S.C. § 1681e(b). When a consumer disputes an item of information, the agency must investigate the dispute and, if the information cannot be verified, delete the information. 15 U.S.C. § 1681i.

6.      The FCRA's accuracy provisions demand that CRAs take *actual steps* to ensure the maximum possible accuracy of the information they report. It is not enough for them to simply parrot information they receive from entities like Citizens, USAA, and LVNV, particularly when a consumer makes a dispute about information reported.

7.      Also, when a consumer like Plaintiff disputes the accuracy of information through the CRAs, those disputes are transmitted to the party furnishing the information. Here, those entities are Citizens, USAA, and LVNV (the "Furnishers"). The FCRA demands that each party separately conduct a reasonable investigation of the consumer's dispute and correct or delete information they learn to be inaccurate or cannot otherwise verify.

8.      Plaintiff brings claims under Section 1681e(b) against Equifax, Experian, and Trans Union because each reported inaccurate account information about Plaintiff regarding fraudulent accounts with USAA, Citizens, and LVNV. When Plaintiff disputed the accuracy of the fraudulent accounts, Equifax, Experian, and Trans Union did not reasonably investigate his disputes, also violating Section 1681i.

9.      The Consumer Financial Protection Bureau has noted, "experience indicates that [CRAs] lack incentives and under-invest in accuracy." Consumer Fin. Prot. Bureau, Supervisory Highlights Consumer Reporting Special Edition 21 (Issue 14, March 2, 2017). This is particularly

true as to how Equifax, Experian, and Trans Union have complied with their now 50-year-old obligation to conduct a meaningful accuracy investigation. Equifax, Experian, and Trans Union have been repeatedly sued by consumers, sanctioned by regulators, and reprimanded by both District and Appellate courts to do more than an automated parroting of what their customer-creditors instruct. Had the Defendant CRAs followed that advice and heeded those warnings, Plaintiff would not have been harmed.

10.    Likewise, the Furnishers violated the FCRA, Section 1681s-2(b), when they received Plaintiff's disputes from the CRAs and failed to reasonably investigate those disputes. Instead, discovery will show all each Furnisher did was consult its own records about the respective fraudulent accounts and confirm to the agencies the inaccurate information it was already reporting. Despite receiving ample notice that Plaintiff was a victim of fraud, the Furnishers continue to report the fraudulent accounts on Plaintiff's credit.

## JURISDICTION AND VENUE

11.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p.

12.    Venue is proper in this District and Division pursuant to 28 U.S.C. § 1391(b)(2). A substantial portion of the events giving rise to the claim occurred in this District and Division.

## PARTIES

13.    Plaintiff is a natural person, and a "consumer" as defined by 15 U.S.C. § 1681a(c).

14.    Equifax is a foreign limited liability company authorized to do business in the Commonwealth of Virginia through its registered agent in Richmond, VA.

15.    Equifax is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f). Equifax is regularly engaged in the business of assembling, evaluating, and disbursing information

concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

16.     Equifax disburses consumer reports to third parties under contract for monetary compensation.

17.     Experian is a foreign corporation authorized to do business in the Commonwealth of Virginia through its registered agent in Glen Allen, VA.

18.     Experian is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f). Experian is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

19.     Experian disburses consumer reports to third parties under contract for monetary compensation.

20.     Trans Union is a foreign limited liability company authorized to do business in the Commonwealth of Virginia through its registered agent in Richmond, VA.

21.     Trans Union is a "consumer reporting agency," as defined by 15 U.S.C. § 1681a(f). Trans Union is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

22.     Trans Union disburses consumer reports to third parties under contract for monetary compensation.

23.     Citizens Bank, N.A. is a bank headquartered in Providence, RI.

24.     Citizens is a "furnisher" of information as defined and governed by 15 U.S.C. § 1681s-2.

25.     USAA Federal Savings Bank is a bank headquartered in San Antonio, TX with a corporate office located in Chesapeake, VA.

26.     USAA is a "furnisher" of information as defined and governed by 15 U.S.C. § 1681s-2.

27.     LVNV Funding, LLC is a collection agency headquartered in Greenville, SC and authorized to do business in the Commonwealth of Virginia through its registered agent in Richmond, VA.

28.     LVNV is a "furnisher" of information as defined and governed by 15 U.S.C. § 1681s-2.

## FACTUAL ALLEGATIONS

### *Sections 1681e(b) and 1681i(a) of the Fair Credit Reporting Act Require Substantive Investigations and Prohibit Mere "Parroting" of the CRA Defendants' Creditor-Customers*

29.     "Congress enacted FCRA in 1970 out of concerns about abuses in the consumer reporting industry. *See* S. Rep. No. 91–517, at 3 (1969); 116 Cong. Rec. 35941 (1970) (statement of Sen. Proxmire); *id.* at 36570 (statement of Rep. Sullivan); . . . In enacting FCRA Congress adopted a variety of measures designed to ensure that agencies report accurate information." *Dalton v. Capital Associated Indus., Inc.*, 257 F.3d 409, 414–15 (4th Cir. 2001). "In recognition of the critical role that CRAs play in the credit markets and the serious consequences borne by consumers because of inaccurate information disseminated in consumer credit reports prepared by CRAs, Congress placed on a CRA what can only be described as very high legal duties of care, set forth . . . in 15 U.S.C. §§ 1681e(b), 1681i(a)(1)(A), and 1681i(a)(3)(A)." *Burke v. Experian Info. Sols., Inc.*, No. 1:10-cv-1064 AJT/TRJ, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011).

30.     "The . . . FCRA . . . was crafted to protect consumers from the transmission of inaccurate information about them, and to establish credit reporting practices that utilize accurate, relevant, and current information in a confidential and reasonable manner." *Guimond v. Trans Union Credit Info. Co.,* 45 F.3d 1329, 1333 (9th Cir. 1995) (citations omitted). "'These consumer-oriented objectives support a liberal construction of the FCRA,' and any interpretation of this remedial statute must reflect those objectives." *Cortez v. Trans Union, LLC,* 617 F.3d 688, 706 (3d Cir. 2010) (quoting *Guimond,* 45 F.3d at 1333).

31.     Over a decade ago, the Third Circuit apprised Trans Union of the high duty of care imposed by Section 1681e(b):

> [T]he distinction between "accuracy" and "maximum possible accuracy" is not nearly as subtle as may at first appear, it is in fact quite dramatic....
>
> There are, of course, inherent dangers in including any information in a credit report that a credit reporting agency cannot confirm is related to a particular consumer. Such information is nearly always "used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for ... credit." 15 U.S.C. § 1681a(d)(1). Allowing a credit agency to include misleading information as cavalierly as Trans Union did here negates the protections Congress was trying to afford consumers and lending institutions involved in credit transactions when it enacted the FCRA....
>
> Congress surely did not intentionally weave an exception into the fabric of the FCRA that would destroy its remedial scheme by allowing a credit reporting agency to escape responsibility for its carelessness whenever misleading information finds its way into a credit report through the agency of a third party....
>
> Trans Union remains responsible for the accuracy in its reports under the FCRA and it cannot escape that responsibility as easily as it suggests here. Congress clearly intended to ensure that credit reporting agencies exercise care when deciding to associate information with a given consumer, and the record clearly supports the jury's determination that Trans Union did not exercise sufficient care here.

*Cortez v. Trans Union, LLC,* 617 F.3d 688, 709-10 (3d Cir. 2010).

32.     Section 1681e(b) sets forth the CRAs' overall du[t]y:

(b) Accuracy of report. Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates.

*Burke v. Experian Info. Sols., Inc.*, No. 1:10-cv-1064 AJT/TRJ, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011).

33.     Section 1681i(a), on the other hand, requires much more from a CRA after a consumer has placed it on notice of an inaccuracy through their dispute:

[I]f the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency directly…of such dispute, the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file … before the end of the 30-day period[.]

15 U.S.C. § 1681i(a)(1)(A).

34.     Section § 1681i(a) imposes "a duty . . . to make reasonable efforts to investigate and correct inaccurate or incomplete information brought to its attention by the consumer." *Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1160 (11th Cir. 1991). "[T]he term 'investigation' is defined as '[a] detailed inquiry or systematic examination' or 'a searching inquiry.'" *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1303 (11th Cir. 2016) (citations omitted).

35.     It has long been the law that a CRA, such as Equifax, Experian, or Trans Union, does not fulfill its "grave responsibility" to conduct a reinvestigation of a consumer's dispute by merely contacting the creditor who supplied the dispute item.  *See, e.g.*, *Pinner v. Schmidt,* 805 F.2d 1258, 1262 (5th Cir.1986) (concluding it was unreasonable for a credit reporting agency to contact only the creditor in its reinvestigation of a disputed debt); *Collins v. Experian Info. Sols., Inc.*, 775 F.3d 1330, 1333 (11th Cir.), *on reh'g sub nom. Collins v. Equable Ascent Fin., LLC*, 781

F.3d 1270 (11th Cir. 2015); *Carlisle v. Nat'l Commercial Servs., Inc.*, No. 1:14-cv-515-TWT-LTW, 2016 WL 4544368, at *9 (N.D. Ga. July 22, 2016), *report & recommendation adopted,* No. 1:14-cv-515-TWT, 2016 WL 4532219 (N.D. Ga. Aug. 29, 2016) ("[A] reasonable factfinder could find that merely contacting [the creditor] was not sufficient to determine whether the disputed information was inaccurate.").

36.     That "grave responsibility" imposed by the FCRA reinvestigation requirement "must consist of something more than merely parroting information received from other  sources." *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir.1997).   Accordingly, "a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute." *Id.* The Court held that Trans Union's reading of Section 1681i(a) to require only parroting "would require it only to replicate the effort it must undertake in order to comply with § 1681e(b)[,] render[ing] the two sections largely duplicative of each other." *Id.*

37.     As the Fourth Circuit explained in *Johnson v. MBNA*:

> The key term at issue here, "investigation," is defined as "[a] detailed inquiry or systematic examination." Am. Heritage Dictionary 920 (4th ed.2000); see Webster's Third New Int'l Dictionary 1189 (1981) (defining "investigation" as "a searching inquiry").

357 F.3d 426, 430 (4th Cir. 2004).

38.     Further, as the CRA Defendants are aware, Courts have held that even though the term "investigation" is not used in § 1681e(b), it is clear that Defendants have a duty to conduct a reasonable initial investigation pursuant to § 1681e(b) as well as § 1681i(a), and that this is "central" to the CRAs' duties of care under that portion of the Act:

> This conclusion flows from the plain meaning of both [§1681e(b) and §1681i(a)]. For example, Section 1681e(b) requires (1) "reasonable procedures" that (2) "assure" (3) "maximum possible accuracy." To "assure" means "to make sure or

certain: put beyond all doubt." *Webster's Third New International Dictionary* 133 (1993). "Maximum" means the "greatest in quantity or highest degree attainable" and "possible" means something "falling within the bounds of what may be done, occur or be conceived . . .." *Id.* at 1396, 1771. It is difficult to imagine how "maximum possible accuracy" could be guaranteed without an adequate investigation. Likewise, Section 1681i(a)(1)(A) requires a "reinvestigation," necessarily implying that an "investigation" was required to have been performed in the first instance.

*Burke*, 2011 WL 1085874, at *4.

39.     It has long been the law – since 1970 in fact – that:

[W]hen a CRA learns or should reasonably be aware of errors in its reports that may indicate systematic problems (by virtue of information from consumers, report users, from periodic review of its reporting system, or otherwise), it must review its procedures for assuring accuracy and take any necessary steps to avoid future problems. Similarly, it should establish procedures to avoid reporting information from its furnishers that appears implausible or inconsistent.

Federal Trade Commission, 40 YEARS OF EXPERIENCE WITH THE FAIR CREDIT REPORTING ACT

(July 2011), at 67.[1]

### Section 1681s-2(b) of The Fair Credit Reporting Act Also Places a Separate and Intentionally Redundant Duty on Furnishers to Perform a Detailed and Systematic Investigation of Consumer Disputes

40.     Today, furnishers such as Citizens, USAA, and LVNV have their own independent duties under the FCRA, principally those found at 15 U.S.C. § 1681s-2.  The duties on furnishers were enacted almost thirty years ago, in 1996. THE CONSUMER CREDIT REPORTING REFORM ACT OF 1996, Pub. L. No. 104-208 (1996).

41.     Furnishers' independent duties under the FCRA include independently investigating consumer disputes by reviewing all relevant information provided by the CRAs. Further, the furnisher must report the results of their investigation to the CRAs and accurately correct, update, or delete incorrect information previously reported to the CRAs.

---

[1] Available at https://www.ftc.gov/sites/default/files/documents/reports/40-years-experience-fair-credit-reporting-act-ftc-staff-report-summary-interpretations/110720fcrareport.pdf.

42.     "[T]he term 'investigation' is defined as '[a] detailed inquiry or systematic examination' or 'a searching inquiry.'" *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1303 (11th Cir. 2016) (citations omitted). As the Fourth Circuit explained in *Johnson v. MBNA*:

> The key term at issue here, "investigation," is defined as "[a] detailed inquiry or systematic examination." Am. Heritage Dictionary 920 (4th ed.2000); see Webster's Third New Int'l Dictionary 1189 (1981) (defining "investigation" as "a searching inquiry").

357 F.3d 426, 430 (4th Cir. 2004).

### *Background Information*

43.     Plaintiff is a victim of an extensive identity theft scheme operated by an individual named Ken Phillips ("Phillips").

44.     In or around summer of 2019, Plaintiff received notification of a webinar from Albert Eugene Lim (aka "Ted Chen" or "Chen") and Steven Tetsuya Morizono (aka "Jeff" or "Jeff Lucin"), which was for the ostensible purposes of helping him improve his credit score.  In fact, the true purpose of the webinar was to create a false sense of trust between Plaintiff and a criminal conspiracy of fraudsters.

45.     Plaintiff was told that Chen worked with an individual named Jeff at a company called Jeff Funding and that Jeff Funding was a business that helped people improve their credit scores.

46.     Following the webinar, Plaintiff was induced by fraudsters via telephone to transmit personally identifying information to the fraudsters, once again for the ostensible purposes of aiding Plaintiff in increasing his credit score.

47.     Rather than assisting Plaintiff in improving his credit score, however, the fraudsters instead used Plaintiff's identifying information to open several financial accounts in Plaintiff's name but without Plaintiff's knowledge or consent.

48.     Thereafter, Plaintiff learned about the fraudulent accounts and began investigating this issue.

49.     Plaintiff discovered that he was a victim of this criminal association in the winter of 2021, whereafter he filed a police report with the Virginia Beach Police Department in May, 2021.

50.     Plaintiff believes the total fraud to be more than $200,000.00 and that the fraudster opened each of the accounts in 2019.

51.     The Citizens account had $50,000 financed.

52.     The SoFi account had $75,000 financed.  LVNV subsequently purchased the SoFi account.

53.     The USAA account had $45,000 financed.

54.     The Upgrade account had $40,000 financed.

55.     Collectively, this Complaint refers to the Citizens account, the SoFi account (subsequently purchased by LVNV), the USAA account, the Upgrade account, and the LVNV account as the "Fraudulent Accounts".

56.     Plaintiff did not open any of the Fraudulent Accounts or authorize anyone to open any of the Fraudulent Accounts.

57.     Given the invasive nature of Chens' and his co-conspirator's fraud, Plaintiff has obtained assistance from the Federal Bureau of Investigation and the Virginia Beach Police Department.

### *Federal Bureau of Investigation*

58.     Plaintiff's disputes of the fraud led him to the Federal Bureau of Investigation.

59.     Plaintiff eventually learned that Chen and Jeff were working for Ken Phillips.

60.     Plaintiff was informed and believes that Phillips has defrauded over 160 individuals

for a total of over $19,000,000.00.

61.     Plaintiff received written communications, about this matter, including an e-mail dated July 12, 2022, from a Victim Specialist with the FBI named Elizabeth Appleton.

62.     This written communication confirmed Plaintiff is a possible victim of a federal crime.

63.     This investigation eventually led to the prosecution of Chen in the matter of *United States of America v. Albert Lugene Lim a.k.a Ted Chen*, Southern District of Texas Case No.: 22-cv-33.

### Virginia Beach Police Report

64.     Plaintiff also sought the assistance of the Virginia Beach Police Department.

65.     Plaintiff communicated with the police department in May 2021 to report the crimes committed by Chen, Jeff, and Phillips.

66.     In that report, Plaintiff explained the basis for Plaintiff's belief that Plaintiff is the victim of identity theft.

### The Dispute Process

67.     Plaintiff was unfortunately forced to make significant payments towards these fraudulent debts.

68.     Plaintiff believed that he would eventually be absolved of these fraudulent debts because the FBI and the police were involved.

69.     After learning that his identity had been stolen, Plaintiff discovered that Equifax, Experian, and Trans Union were reporting the Fraudulent Accounts on his credit.

70.     Plaintiff began disputing the various Fraudulent Accounts in or around April 2023.

71.     Plaintiff's disputes included written and telephonic disputes directly to the furnishers. as well as "indirect" disputes which he submitted to the CRAS.

72.     In each dispute, Plaintiff explained that he is the victim of identity theft and demanded that the following accounts be deleted:

    a.     Citizens

    b.     USAA

    c.     SoFi Bank

    d.     Upgrade, Inc.

73.     Plaintiff also provided extensive documentation to support Plaintiff's disputes, including:

    a.     The Virginia Beach Police Department Report

    b.     The FBI's Victim Case Update Letter

    c.     A copy of the indictment charging the aforementioned fraudsters

74.     Plaintiff then received the results of the purported investigations conducted by each of the Furnishers and CRAs.

75.     Despite receipt of Plaintiff's disputes, Defendants continued inaccurately reporting the Fraudulent Accounts on Plaintiff's credit.

76.     The CRAS did not provide notice to Plaintiff that Plaintiff's disputes were "frivolous or irrelevant," pursuant to 15 U.S.C. § 1681i(a)(3).

77.      To date, the Furnishers and CRA Defendants continue reporting Fraudulent Accounts on Plaintiff's credit reports.

78.     The Furnishers submit inaccurate credit information regarding Plaintiff to the CRA Defendants every thirty days.

79.     Each Furnisher actively engaged in collection efforts directed towards Plaintiff regarding the Fraudulent Accounts.

80.     Through these reporting and collection efforts, each Furnisher is continuing to maintain an interest in the Fraudulent Accounts.

### The CRA Defendants Did Not and Do Not
### Conduct Any Investigation of Most Consumer Disputes

81.     Unknown to Plaintiff until this lawsuit, it has long been the practice of Equifax, Experian, and Trans Union to refuse to perform the statutorily mandated FCRA investigation and instead delegate all action in response to consumer disputes to a third-party outsource vendor located overseas.  Equifax and Trans Union use a vendor which was previously known as Intelenet Global Services and is now known as Teleperformance.

82.     Experian uses a sister company, Experian Chile (or Experian Costa Rica) to process its mail disputes.[2]

83.     Here is how the written mail dispute process actually works: for Equifax, a third-party document processing company in Atlanta maintains several Post Office boxes for receiving consumer mail to Equifax such as disputes, requests for a credit file disclosure, or other communication.  That mailbox company receives consumer disputes and scans them into a batch with other disputes.

84.     Trans Union, on the other hand, receives and scans the mail into batches directly out of its facility in Eastern Pennsylvania.

---

[2] Defendant Experian outsources its dispute procedures to an affiliated company, Experian Services Chile, S.A, in Santiago, Chile. Experian long ago lost the argument that testimony from these dispute agents requires more than a garden-variety Rule 30 notice. *Calderon v. Experian Info. Sols., Inc.*, 290 F.R.D. 508, 510 (D. Idaho 2013). Such was confirmed in a recent case in the Eastern District of Virginia with Plaintiff's Counsel opposing, wherein Experian produced its Chilean dispute investigator for remote deposition through a Rule 30(b)(1) notice without opposition. *Sublett v. Nissan of Richmond, LLC, et al.*, No. 3:20-cv-156 (E.D. Va.). To the extent Experian would argue here that it cannot produce its Chilean dispute agents pursuant to a Rule 30 notice, then Plaintiff will pursue her 1681i failure-to-investigate claim on the same theory—no investigation was conducted by the CRA—as she alleges against Equifax for its farming-out investigations to Teleperformance.

85.     Both Teleperformance and the Experian affiliates use low-wage employees to work quickly to process consumer dispute letters received. The employees skim the letters and select one of a handful of codes from a dropdown menu to best describe the consumer's detailed dispute information in 2 digits.  For example, the most common relevant code is: "01 Not his/her."

86.     Teleperformance agents and Experian Chile agents are not allowed to do any of the following things: contact the consumer, use the telephone or e-mail to investigate, research, contact the furnisher directly, or take longer than 5 minutes per dispute.

87.     The dispute processing agents are not hired to perform actual FCRA investigations. Instead, the agent's sole responsibility is to read consumer dispute letters, select one of a handful of common dispute codes from a drop-down menu, and then click that code.

88.     In fact, all three Defendant CRAs strongly encourage consumers to make disputes through their online websites.  When consumers do so, the consumer must click one of just a few available dispute reasons (such as "The balance and/or past due amount are/is incorrect").  The online dispute then is outputted into the "e-Oscar" system described below without ever touching human hands or being read by human eyes at Equifax, Trans Union, or Experian.  It gets sent to the Defendant CRAs' creditor customers (such as Citizens, USAA, and LVNV) for their sole review and consideration.

89.     Both Equifax and Trans Union have taken the position in other litigation that they have no control over Teleperformance (fka "Intelenet"). For example, under oath before another court, Equifax's representative employee testified: "Intelenet has no corporate affiliation with Equifax. Intelenet is not a corporate partner of Equifax. Rather, Intelenet is a company wholly separate from Equifax and is a party to a contract with Equifax wherein Equifax hired Intelenet to assist Equifax with various matters. Neither Mr. Negi nor Mr. Singh [the dispute processing

agents] are employees of Equifax." *Miller v. Equifax Info. Serv.*, Case No. 4:19-cv-584, ECF 47-1 (M.D. Fla. Sept. 18, 2020). And in its briefing in that same case, Equifax argued, "Courts have determined that Intelenet is a separate legal entity, not controlled by a party."

90.     Trans Union has taken and succeeded with this same position. *See, e.g.*, *Wilcox v. Servis One, Inc.*, No. 1:19-cv-02545-RDB (D. Md.), ECF 71 (ruling that Trans Union did not have control or the ability to produce for deposition Indian employees of Intelenet).

91.     Regardless of whether these statements by the CRAs are correct, the credit reporting agencies believe that they cannot direct, control, manage, or reliably influence the employees of their respective third-party outsource vendors.

92.     Equifax, Experian, and Trans Union themselves did not conduct any reinvestigation of Plaintiff's many disputes. Instead, they merely caused them to be removed from their control to be saved within a database by an overseas data-processing vendor.

### The CRA Defendants Forwarded Plaintiff's Disputes to the Furnishers, Who Did Nothing

93.     In each instance in which Plaintiff disputed the fraudulent accounts with the CRAs, the CRAs forwarded Plaintiff's disputes to the Furnishers using an electronic system called "e-Oscar," which is an industry-wide process by which consumer disputes are electronically communicated to furnishers and dispute results back to CRAs.

94.     On information and belief, e-Oscar is also the system by which the Furnishers have agreed they will accept consumer disputes from the CRAs.

95.     Each instance in which a Furnisher received one of Plaintiff's disputes from a CRA, that Furnisher became obligated under the FCRA to investigate that dispute.

96.     The Furnishers repeatedly failed to reinvestigate Plaintiff's complaints.

97.     Despite Plaintiff's diligent efforts to use the legal means that are available to him to dispute the fraudulent information, the Furnishers continue to report the accounts as accurate to the CRAs. Discovery will show that all each Furnisher did when supposedly investigating Plaintiff's disputes from the CRAs was consult its own internal reporting records and simply report back to the CRAs the same inaccurate information Plaintiff was disputing.

98.     The Furnishers should have discovered from their own records, including Plaintiff's formal disputes, that the information being reported was inaccurate and materially misleading.

99.     Plaintiff contends that it was unreasonable for the Furnishers to not contact Plaintiff for further information if needed, to not contact the Virginia Beach Police Department, and, to not contact the Federal Bureau of Investigation.

100.    On dates better known to Equifax and the Furnishers, Equifax forwarded Plaintiff's disputes to the Furnishers.

101.    On dates better known to Experian and the Furnishers, Experian forwarded Plaintiff's disputes to the Furnishers.

102.    On dates better known to Trans Union and the Furnishers, Trans Union forwarded Plaintiff's disputes to the Furnishers.

103.    Accordingly, the Furnishers each failed to conduct a reasonable investigation with respect to the disputed information as required by 15 U.SC. § 1681s-2(b)(1)(A).

104.    The Furnishers failed to review all relevant information provided by Plaintiff in the dispute to the CRAs, as required by and in violation of 15 U.SC. § 1681s-2(b)(1)(B).

105.    Due to the Furnishers' failures to reasonably investigate, the Furnishers further failed to correct and update Plaintiff's information as required by 15 U.SC. § 1681s-2(b)(1)(E),

thereby causing continued reporting of inaccurate information in violation of 15 U.S.C. § 1681-s(2)(b)(1)(C).

106.    By inaccurately reporting account information after notice and confirmation of its errors, the Furnishers failed to take appropriate measures as required by 15 U.S.C. § 1681s-2(b)(1)(D) and (E).

107.    The Defendant CRAs responded to Plaintiff's disputes, claiming the reported information was verified as accurate and the information was updated. This response confirms that the Defendant CRAs communicated Plaintiff's disputes to the Furnishers.

108.    Upon information and belief, CRA Defendants timely notified the Furnishers of Plaintiff's disputes, via e-OSCAR or otherwise, and provided the supporting documents with Plaintiff's disputes.

109.    Upon information and belief, the Furnishers received timely notice of Plaintiff's disputes from Equifax, Experian, and Trans Union, and the supporting documents submitted with Plaintiff's disputes.

110.    By their actions as described herein, the Furnishers furnished and communicated false credit information regarding Plaintiff.

### *USAA Repeatedly Obtained and Used Plaintiff's*
### *Consumer Report(s) Without a Permissible Purpose*

111.    Accessing consumer reports is presumptively illegal. To overcome this presumption, a party seeking to access consumer reports must have a permissible purpose for doing so and must certify to the agency from which it seeks reports the FCRA purpose for which it will use the reports and that it will use the reports for no other purpose. 15 U.S.C. § 1681(f).

112.    One such permissible purpose that arises in the credit realm is for reports to issue "[t]o a person which [the reporting agency] has reason to believe—A intends to use the information

in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of, the consumer." 15 U.S.C. § 1681b(a)(3)(A).

113.   Likewise, Courts have long held that reports issued to a user involving an extension of credit or for collection purposes as to credit fall within the coverage of § 1681b(a)(3)(A). *Huertas v. Galaxy Asset Mgmt.*, 641 F.3d 28, 34 (3d Cir. 2011) ("the statute expressly permits distribution of a consumer report to an entity that 'intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of, the consumer.'"); *Korotki v. Thomas, Ronald & Cooper, P.A.*, 131 F.3d 135 (4th Cir. 1997) (Defendant "was seeking to collect an account owed by the consumer, § 1681(b)(3)(A), likewise a permissible purpose"); *Cooper v. Pressler & Pressler, LLP*, 912 F. Supp. 2d 178, 188 (D.N.J. 2012) ("Capital One could rightfully obtain a copy of Plaintiff's consumer report from a CRA in order to review, or collect upon, Plaintiff's MasterCard credit card account.").

114.   Apart from 15 U.S.C. § 1681b(a)(3)(A), no other permissible purpose could conceivably allow USAA to access Plaintiff's consumer reports.

115.   USAA first accessed Plaintiff's credit file in connection with its issuance of the fraudulent loan in 2021. The information USAA received purportedly authorizing it to access Plaintiff's consumer report(s) bore multiple hallmarks of identity theft. Even a cursory evaluation of the information submitted to USAA to purportedly authorize it to access Plaintiff's credit report to issue a loan would have revealed that the loan application was fraudulent. Nonetheless, USAA illegally accessed Plaintiff's consumer report(s) and then issued a fraudulent loan based on those consumer report(s).

116.    In October of 2022, USAA yet again illegally accessed Plaintiff's consumer reports at least twice. USAA did so despite having actual knowledge, from Plaintiff's direct and indirect disputes, that the loan with USAA was opened fraudulently and without Plaintiff's authorization, knowledge, or consent.

117.    But for USAA's illegal access of Plaintiff's consumer reports, the fraudulent credit loan would not have been issued.

118.    USAA then used information from one or more illegally obtained consumer report(s) regarding Plaintiff to further its illegal efforts to collect on the fraudulently loan.

### *Plaintiff Suffered Actual Harm*

119.    Equifax, Experian, and Trans Union continued to report the fraudulent Furnisher accounts on Plaintiff's credit reports even after being notified that this information is false.

120.    Plaintiff attempted to resolve these matters with Defendants and his credit was significantly destroyed by Defendants' failure to correct the inaccurate reporting.

121.    As a result of the inaccurate reporting and failures to properly respond to Plaintiff's disputes, Plaintiff has suffered damages, including, but not limited to:

a.    Harm to credit opportunities;

b.    Monies lost by attempting to fix his credit, e.g., communication costs, postage for disputes;

c.    Loss of time attempting to correct the inaccuracies;

d.    Stress associated with attempting to resolve this matter; and

e.    Mental anguish, stress, aggravation, and other related impairments to the enjoyment of life, including but not limited to: Anxiety, frustration, stress, lack of sleep, nervousness, anger, and embarrassment.

122.    Plaintiff's distress continues to this day because these large charge-offs mischaracterize Plaintiff as someone that avoids financial obligations, and they significantly harm Plaintiff's credit score.

123.    Moreover, Plaintiff is incredibly concerned that the outstanding debts will have a direct impact on Plaintiff's employment.

### Defendants' Conduct was Willful

124.    The FCRA allows for a remedy for a "willful" violation.  A willful act or violation includes, "not only knowing violations of [the statute], but reckless ones as well." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, at 57 (2007).  A "reckless" action includes conduct whereby "the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id.* at 69.

125.    Proof of willfulness includes, for example, "evidence that other consumers have lodged complaints similar to" the one made by Plaintiff and a failure to make the correction right away. *Dalton*, 257 F.3d at 418; *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142, 151 (4th Cir. 2008).

126.    As detailed above, the FCRA section at issue here, and informative guidance, have been around now for over 50 years.  The language of § 1681e(b) has not changed.  The CRA Defendants' dispute investigation obligations under § 1681i(a) have not changed. The FCRA's caution of Defendants' "grave responsibilities" to ensure accuracy has not changed.

127.    The CRA Defendants have received numerous disputes and other complaints regarding the Furnishers at issue in this case—sufficient to require a reasonable company to at least examine or investigate further before blindly accepting further reporting.

128.    Just in federal court alone, during the past decade, the Furnishers in this case have defended approximately 1,782 consumer credit lawsuits. (Citizens has defended 97, USAA has defended 156, and LVNV has defended 1,529).

129.    In many of these FCRA lawsuits brought by a consumer, one or more of the CRA Defendants was a named co-defendant.

130.    The CRA Defendants knew or should have known of this litigation history.

131.    The CRA Defendants use and have access to PACER to investigate and monitor consumer complaints.

132.    The CFPB has maintained a Consumer Complaint database since 2017.  It receives a small percentage of the total consumer credit reporting complaints made nationwide, as many multiples more are made directly to the Defendants, and/or to other government agencies, attorneys, or non-profit organizations.

133.    Each Defendant regularly receives unredacted consumer dispute details from this database.

134.    Since the database began accepting complaints, the CFPB has sent hundreds of thousands of consumer credit reporting complaints to Equifax.

135.    Since the database began accepting complaints, the CFPB has sent hundreds of thousands of consumer credit reporting complaints to Experian.

136.    Since the database began accepting complaints, the CFPB has sent hundreds of thousands of consumer credit reporting complaints to Tran Union.

137.    Further, over 190,000 of the CFPB complaints against Equifax, more than 160,000 complaints as to Trans Union, and over 145,000 complaints about Experian were based largely on their failure to reasonably investigate consumer disputes.

138.    Just in the last 12 months alone, Equifax, Experian, and Trans Union have each been sued by consumers alleging their violation of the FCRA over 2,000 times. Most of these alleged that the defendant violated § 1681i(a) by failing to conduct a lawful reinvestigation of the consumer's accuracy dispute.  This complaint history has been true for nearly every year over the last decade.

139.    While the thousands of consumer complaints and hundreds of thousands of consumer disputes alone would have put Defendants on notice of the failures of their dispute investigation procedures in ensuring accuracy, numerous Federal District and Circuit Courts have placed the CRA Defendants on notice that they may not merely "parrot" what their creditor-customer tells them if the consumer had provided a substantive and detailed dispute.

140.    Equifax, Experian, and Trans Union have had actual notice from numerous other courts that their blind ACDV "parroting" is unlawful. *See, e.g.*, *Centuori v. Experian Info. Sols., Inc.*, 431 F. Supp. 2d 1002, 1008 (D. Ariz. 2006) ("'The grave responsibility imposed by [the FCRA] must consist of something more than merely parroting information received from other sources.'"); *Schweitzer v. Equifax Info. Sols. LLC*, 441 F. App'x 896, 904 (3d Cir. 2011); *Pourfard v. Equifax Info. Sols. LLC*, 2010 WL 55446 (D. Or. Jan. 7, 2010) ("[T]he caselaw is clear that a reporting agency does not act reasonably under the FCRA by deferring entirely to another source of information."); *Bradshaw v. BAC Home Loans Servicing, LP*, 816 F. Supp. 2d 1066, 1073-74 (D. Or. 2011)("[Equifax] instead utilized an automated dispute system to verify the accuracy of plaintiffs' account. Many courts, including this one, have concluded that when a CRA is affirmatively on notice that information received from a creditor may be suspect, it is unreasonable as a matter of law for the agency to simply verify the creditor's information through the ACDV process without additional investigation.").

141.    Equifax has even been warned by its home District Court, the Northern District of

Georgia, which detailed:

> Equifax argues that the creditor is the party responsible for investigating the dispute, once notified of it by the reporting agency. 15 U.S.C.A. § 1681s-2(b) (1998). According to Equifax, the reporting agency's duty under § 1681i is fulfilled once it forwards the complaint to the creditor, the entity in the best position to undertake an accurate investigation. Under § 1681s-2(b), furnishers of information, such as creditors, have certain duties to investigate consumers' disputes. Yet, this does not end the inquiry, or establish that the reporting agency has no responsibility beyond serving as a conduit for consumers' complaints.
>
> To the contrary, a credit reporting agency does not conduct a reasonable investigation by deferring entirely to another source of information. "In a reinvestigation of the accuracy of credit reports, a credit bureau must bear some responsibility for evaluating the accuracy of information obtained from subscribers." *Stevenson,* 987 F.2d at 293. The FCRA "places the burden of investigation squarely on" the reporting agency. *Id.*; *see also Henson v. CSC Credit Servs.,* 29 F.3d 280, 286-87 (7th Cir. 1994); *Swoager v. Credit Bureau,* 608 F.Supp. 972, 976 (M.D. Fla.1985).

*Sampson v. Equifax Info. Servs., LLC*, No. CIV.A. CV204-187, 2005 WL 2095092, at *5 (S.D.

Ga. Aug. 29, 2005).

142.    Defendants have long had specific notice of these requirements. The seminal

Circuit Court decision addressing § 1681i(a) and finding that a CRA does not conduct a reasonable

reinvestigation of a consumer's substantive dispute if it merely "parrots" its creditor-customer was

a Trans Union case. *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997).

Defendants' notice was so substantial that another court instructed the jury in a § 1681i(a) trial:

> In assessing the issue of notice to Trans Union, you are instructed that, on several occasions since 1997, decisions of federal courts have informed . . . that the Fair Credit Reporting Act's Requirement for a reasonable reinvestigation must consist of something more than simply the parroting of information received from other sources and/or that a credit reporting agency does not act reasonably by deferring entirely to another source of information, such as a creditor.

*Mullins v. Equifax Info. Servs., LLC*, CIV. 3:05-cv-888 (E.D. Va. Aug. 27, 2007).

143.     Defendants have also been repeatedly criticized by Federal and state regulators, and consumer groups for the refusal or failure to conduct substantive reinvestigations.

144.     In 2015, a large group of state Attorneys General forced a consent order from the CRA Defendants by which they were required to develop procedures necessary to comply with the FCRA.[3]  The AG Settlement required amongst many changes and mandates that the Defendant comply with § 1681i(a).

145.     The AG Settlement also required the CRA Defendants to conduct significant research and data gathering—even creating a "working group" to address these issues, and to develop special procedures to handle disputes as in this case.  Notwithstanding these requirements, the CRA Defendants did not meaningfully comply with the AG Settlement in these regards.

146.     Defendants are also aware of substantive and detailed criticism by public interest groups about their automated dispute system.  For example, in 2009, the National Consumer Law Center ("NCLC"), the organization that publishes the leading legal treatise in this field, also published a scathing research paper detailing the actual process followed by Defendants when a consumer makes a dispute.  That report was updated in 2019.  AUTOMATED INJUSTICE REDUX *Ten Years after a Key Report, Consumers Are Still Frustrated Trying to Fix Credit Reporting Errors*, National Consumer Law Center, February 2019. ("NCLC Report").[4]

147.     The NCLC Report summarized its context:

Ten years ago, the National Consumer Law Center (NCLC) issued Automated Injustice: How a Mechanized Dispute System Frustrates Consumers Seeking to Fix Errors in their Credit Reports, the landmark report on the serious dysfunctions in the American credit reporting system. Since then, the Consumer Financial Protection Bureau (CFPB) began exercising supervision authority over the Big Three credit bureaus (Equifax, Experian and Trans Union), and started the difficult task of compelling them to reform their procedures and practices. A coalition of

---

[3] *Available at* https://www.ohioattorneygeneral.gov/Files/Briefing-Room/News-Release/Consumer-Protection/2015-05-20-CRAs-AVC.aspx.
[4] *Available at* https://www.nclc.org/images/pdf/credit_reports/automated-injustice-redux.pdf.

more than 30 state Attorneys General reached a breakthrough settlement with the credit bureaus in 2015, requiring an array of reforms. Despite these very laudable achievements, the credit bureaus and the companies that supply them with information still have serious problems in ensuring the accuracy of credit reports, affecting millions of American consumers. The dispute process required by the Fair Credit Reporting Act (FCRA) that was intended to fix these problems remains ineffective and biased.

148.    Among many of Defendants' accuracy failures, the NCLC Report discovered:

- **Insufficient Information Conveyed and Considered in Investigation**.  Credit bureaus use the highly automated e-OSCAR system to convey disputes to furnishers, primarily using shorthand two- or three-digit codes, and at most only a line or two of text in a minority of instances. The credit bureaus use the same four or five codes over 80% of the time.

- **Failure to Transmit Information Submitted by the Consumer**. Credit bureaus failed to send supporting documentation submitted by consumers to furnishers, in clear violation of the FCRA.

- **Perfunctory Credit Bureau Investigations**. Credit bureaus limit the role of their employees who handle disputes, or of the foreign workers employed by their offshore vendors, to little more than selecting these two- or three-digit codes. Workers do not examine documents, contact consumers by phone or email, or exercise any form of human discretion in resolving a dispute.

- **Credit Bureaus Always Side with Furnishers**. Credit bureaus are universally biased in favor of furnishers and against consumers in disputes. In a practice known as "parroting," credit bureaus blindly adopted the response of the furnisher without performing any independent review.

NCLC Report at 6.

149.    Proportionately similar, the Furnishers in this case are well-informed of their duties because they have also been sued in federal court repeatedly for consumer credit claims by consumers – many involving alleged violations of the FCRA.

150.    Each Furnisher was duly notified, and its legal team or other management personnel in charge of Fair Credit Reporting Act (FCRA) compliance had reviewed *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142 (4th Cir. 2008).

151.    Each Furnisher was duly notified, and its legal team or other management personnel in charge of Fair Credit Reporting Act (FCRA) compliance had reviewed *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295 (11th Cir. 2016).

152.    Each Furnisher was duly notified, and its legal team or other management personnel in charge of Fair Credit Reporting Act (FCRA) compliance had reviewed *Johnson v. MBNA,* 357 F.3d 426 (4th Cir. 2004).

153.    Each Furnisher was duly notified, and its legal team or other management personnel in charge of Fair Credit Reporting Act (FCRA) compliance had reviewed *Daugherty v. Ocwen Loan Servicing, LLC*, 701 F. App'x 246 (4th Cir. 2017).

154.    Each Furnisher was duly notified, and its legal team or other management personnel in charge of Fair Credit Reporting Act (FCRA) compliance had reviewed *Bach v. First Union Nat. Bank*, 149 F. App'x 354 (6th Cir. 2005).

155.    Despite the notice and judicial, regulatory, and public interest criticism, Defendants have refused to change their dispute investigation process because it would cost too much money to do so.

156.    Defendants' procedures imposed on Plaintiff and similarly situated consumers an unjustifiably and unreasonable risk of harm that could have been mitigated or avoided with just modest imposition.

157.    By intentionally reporting continuing obligations, Defendants acted in conscious disregard for Plaintiff's rights.

158.    Reporting ongoing obligations despite the fraudulent nature of these accounts shows that Defendants took actions involving unjustifiably high risks of harm that were either known or so obvious that they should have been known.

159.    The continued pursuit of Plaintiff through direct collection efforts and credit reporting despite the fraudulent nature of these accounts shows that the Furnishers took actions involving unjustifiably high risks of harm that were either known or so obvious that they should have been known.

160.    Because Plaintiff's efforts to be absolved of the Fraudulent Accounts were unsuccessful, Plaintiff was required to bring this action to finally resolve Plaintiff's remaining disputes.

## CLAIMS FOR RELIEF

### COUNT I:
### VIOLATION OF FAIR CREDIT REPORTING ACT
### 15 U.S.C. § 1681e(b) - *against Equifax, Experian, and Trans Union*

161.    Plaintiff realleges and incorporates all other factual allegations set forth in the Complaint.

162.    Equifax, Experian, and Trans Union each violated 15 U.S.C. § 1681e(b) by failing to establish and/or to follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiff's credit reports and credit files they published and maintained concerning Plaintiff when they reported the fraudulent account information from the Furnishers.

163.    As a result of Trans Union's, Equifax's, and Experian's violations of 15 U.S.C. § 1681e(b) Plaintiff suffered actual damages, including but not limited to: Anxiety, frustration, stress, lack of sleep, nervousness, anger, embarrassment, loss of privacy, harm to his reputation,

lost credit opportunities, lost time attempting to get the errors fixed, and money spent on postage for dispute letters.

164.   Further, after Plaintiff's disputes put them on notice of likely inaccuracies and reasons to doubt the correctness of the Furnishers' reporting, Equifax, Experian, and Trans Union each ignored that information and did not use any human or substantive review to confirm and verify that its procedures were ensuring maximum possible accuracy of Plaintiff's credit reports.

165.   Equifax, Experian, and Trans Union each furnished multiple consumer reports to third parties containing the inaccurate tradeline information and they did so after receiving notice of these inaccuracies.

166.   The violations by Equifax, Experian, and Trans Union were willful, rendering each of the CRA Defendants individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Equifax, Experian, and Trans Union were negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o.

167.   Plaintiff is entitled to recover actual damages or statutory damages, punitive damages, costs, and attorney's fees from Equifax, Experian, and Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**COUNT II:**
**VIOLATION OF FAIR CREDIT REPORTING ACT**
**15 U.S.C. § 1681i(a) -** *against Equifax, Experian, and Trans Union*

168.   Plaintiff realleges and incorporates all other factual allegations set forth in the Complaint.

169.   Equifax, Experian, and Trans Union each violated 15 U.S.C. § 1681i(a)(1) by failing to conduct a reasonable reinvestigation to determine whether the disputed information was

inaccurate and record the current status of the disputed information or delete the item from each of Plaintiff's credit files.

170.    Equifax, Experian, and Trans Union each violated 15 U.S.C. § 1681i(a)(2) by conduct which includes, but is not limited to, failing to send to the furnisher all relevant information that they each received with Plaintiff's disputes.

171.    Equifax, Experian, and Trans Union each violated 15 U.S.C. § 1681i(a)(4) by failing to review and consider all relevant information submitted by Plaintiff regarding the fraudulent accounts.

172.    Equifax, Experian, and Trans Union each violated 15 U.S.C. § 1681i(a)(5)(A) by failing to promptly delete the disputed inaccurate information from Plaintiff's credit files or modify the item of information upon a lawful reinvestigation.

173.    As a result of Equifax's, Trans Union's and Experian's violations of 15 U.S.C. § 1681i(a), Plaintiff suffered actual damages, including but not limited to: Anxiety, frustration, stress, lack of sleep, nervousness, anger, embarrassment, loss of privacy, harm to his reputation, lost credit opportunities, lost time attempting to get the errors fixed, and money spent on postage for dispute letters.

174.    The violations by Equifax, Experian, and Trans Union were willful, rendering each of the CRA Defendants individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Equifax, Experian, and Trans Union were negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o.

175.    Plaintiff is entitled to recover actual damages or statutory damages, punitive damages, costs, and attorney's fees from Equifax, Experian, and Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## COUNT III:
## VIOLATION OF FAIR CREDIT REPORTING ACT
### 15 U.S.C. § 1681s-2(b)(1)(A) & (B) - *against all Furnishers*

176.    Plaintiff realleges and incorporates all other factual allegations set forth in the Complaint.

177.    Each Furnisher violated 15 U.S.C. § 1681s-2(b)(1)(A) by failing to fully conduct a reasonable investigation of Plaintiff's disputes after his disputes were furnished to it by Equifax, Experian, and Trans Union.

178.    Each Furnisher violated 15 U.S.C. § 1681s-2(b)(1)(B) by failing to review all relevant information provided to it when Equifax, Experian, and Trans Union forwarded Plaintiff's disputes.

179.    As a result of each Furnisher's conduct, action, and inaction, Plaintiff suffered damage as alleged above, including by example only and without limitation: Anxiety, frustration, stress, lack of sleep, nervousness, anger, embarrassment, loss of privacy, harm to his reputation, lost credit opportunities, lost time attempting to get the errors fixed, and money spent on postage for dispute letters.

180.    The violations by the Furnishers were willful, rendering them each liable for punitive damages in amounts to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, each Furnisher was negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o.

181.    Plaintiff is entitled to recover actual or statutory damages, punitive damages, costs and attorney's fees from each Furnisher in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## COUNT IV:
## VIOLATION OF FAIR CREDIT REPORTING ACT
### 15 U.S.C. § 1681s-2(b)(1)(C) & (D) - *against Citizens & USAA*

182.    Plaintiff realleges and incorporates all other factual allegations set forth in the Complaint.

183.    On one or more occasions within the past two years, by example only and without limitation, Citizens & USAA violated 15 U.S.C. § 1681s-2(b)(1)(C) and (D) by publishing the fraudulent inaccuracies within Plaintiff's credit files with Equifax, Experian, and Trans Union without also including a notation that this debt was disputed and by failing to correctly report results of an accurate investigation to each credit reporting agency.

184.    Specifically, Citizens & USAA failed to add the "XB" code to the CCC (Compliance Condition Code) field in the ACDV dispute forms each time that they responded to disputes sent by the CRA Defendants.

185.    On information and belief, Plaintiff alleges that Citizens & USAA rarely, if ever, add the XB code or other notation that an account is disputed when they respond to e-Oscar ACDVs.

186.    Citizens knew that the Plaintiff previously disputed the subject account on multiple occasions directly with Citizens and its agents.

187.    USAA knew that the Plaintiff previously disputed the subject account on multiple occasions directly with USAA and its agents.

188.    Plaintiff's disputes were, at a minimum, *bone fide*.

189.    In fact, Plaintiff's disputes were justified because he is a victim of an extensive fraudulent scheme.

190.    Citizens & USAA were aware of the *Saunders v. B.B. & T.* FCRA decision by the Fourth Circuit when they followed the ACDV procedures used regarding Plaintiff's disputes.

191.    On information and belief, Plaintiff alleges that the procedures followed regarding the Plaintiff's FCRA disputes through e-Oscar were the procedures that Citizens intended its employees or agents to follow.

192.    On information and belief, Plaintiff alleges that Citizen's employee or agent did not make a mistake (in the way in which they followed Citizen's procedures) when they received, processed, and responded to the CRA's ACDVs and did not include the XB code in the CCC field.

193.    On information and belief, Plaintiff alleges that the procedures followed regarding the Plaintiff's FCRA disputes through e-Oscar were the procedures that USAA intended its employees or agents to follow.

194.    On information and belief, Plaintiff alleges that USAA's employee or agent did not make a mistake (in the way in which they followed USAA's procedures) when they received, processed, and responded to the CRA's ACDVs and did not include the XB code in the CCC field.

195.    On information and belief, Plaintiff alleges that neither Citizens nor USAA have materially changed their FCRA investigation procedures regarding the CCC field in ACDVs after learning of their failures in this case.

196.    As a result of Citizen's and USAA's violations of 15 U.S.C. § 1681s-2(b)(1)(C) and (D), Plaintiff suffered actual damages, including but not limited to: Anxiety, frustration, stress, lack of sleep, nervousness, anger, embarrassment, loss of privacy, harm to his reputation, lost credit opportunities, lost time attempting to get the errors fixed, and money spent on postage for dispute letters.

197.    The violations by Citizens & USAA were willful, rendering them each liable for punitive damages in amounts to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Citizens & USAA were each negligent, entitling the Plaintiff to recovery under 15 U.S.C. § 1681o.

198.    Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs and attorney's fees from both Citizens & USAA in amounts to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**COUNT V:**
**VIOLATION OF FAIR CREDIT REPORTING ACT**
**15 U.S.C. § 1681s-2(b)(1)(E) - *against all Furnishers***

199.    Plaintiff realleges and incorporates all other factual allegations set forth in the Complaint.

200.    Each Furnisher violated 15 U.S.C. § 1681s-2(b)(1)(E) by failing to accurately correct and update or delete information from Plaintiff's file after receiving Plaintiff's disputes from Equifax, Experian, and Trans Union. This failure to correct Plaintiff's information resulted from each Furnisher's failure to investigate as articulated in this Complaint, after the Furnisher received notice of Plaintiff's disputes from Equifax, Experian, and Trans Union.

201.    As a result of this conduct (the action and inaction of each Furnisher), Plaintiff suffered actual damages, including but not limited to: Anxiety, frustration, stress, lack of sleep, nervousness, anger, embarrassment, loss of privacy, harm to his reputation, lost credit opportunities, lost time attempting to get the errors fixed, and money spent on postage for dispute letters.

202.    The violations by the Furnishers were willful, rendering them each liable for punitive damages in amounts to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, each Furnisher was negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o.

203.    Plaintiff is entitled to recover actual or statutory damages, punitive damages, costs and attorney's fees from each Furnisher in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

### COUNT VI:
### VIOLATION OF FAIR CREDIT REPORTING ACT
### 15 U.S.C. § 1681b(f) - *against USAA*

204.    Plaintiff realleges and incorporates all other factual allegations set forth in the Complaint.

205.    USAA repeatedly violated 15 U.S.C. § 1681(b)(f) by unlawfully obtaining Plaintiff's consumer reports without his written authorization or a permissible purpose.

206.    USAA also violated 15 U.S.C. § 1681b(f) by failing to accurately and lawfully certify a permissible purpose when accessing Plaintiff's consumer report(s).

207.    Plaintiff's consumer report(s) contained a wealth of private information which USAA had no right to access absent a specific Congressional license to do so.

208.    As a result of USAA's conduct, action, and inaction, Plaintiff suffered actual damages, including but not limited to: invasion of his statutory right to confidentiality of his personal information, issuance of a fraudulent loan in his name, loss of credit opportunities, time and money spent attempting to correct inaccurate reporting, anxiety, frustration, stress, lack of sleep, nervousness, anger, embarrassment, harm to his reputation, and lost credit opportunities

209.    The violations by USAA were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, USAA

was negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o.

210.   Plaintiff is entitled to recover actual or statutory damages, punitive damages, costs and attorney's fees from USAA in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands a trial by jury of all issues triable by jury.

## DEMAND FOR RELIEF

Plaintiff therefore respectfully requests that this Court:

(1)   Award Plaintiff actual or statutory damages and punitive damages for violations of the FCRA by Equifax, Experian, Trans Union, Citizens, USAA, and LVNV;

(2)   Award Plaintiff attorney's fees and costs against Equifax, Experian, Trans Union, Citizens, USAA, and LVNV;

(3)   Award Plaintiff pre-judgment and post-judgment interest at the legal rate; and

(4)   Award other relief as the Court deems appropriate.


**TRIAL BY JURY IS DEMANDED.**

**RESPECTFULLY,**

**BRYAN HARRELL**

By:  */s/ Leonard A. Bennett*
Leonard A. Bennett, VSB #37523
Craig C. Marchiando, VSB #89736
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Blvd., Suite 1-A
Newport News, VA 23601
Telephone: (757) 930-3660
Facsimile: (757) 930-3662

Email: lenbennett@clalegal.com
Email: craig@clalegal.com


Matthew M. Loker, Esq.*
LOKER LAW, APC
1303 East Grand Avenue, Suite 101
Arroyo Grande, CA 93420
Telephone: (805) 994-0177
Facsimile: (805) 994-0197
matt@loker.law

Albert R. Limberg, Esq.*
LAW OFFICE OF ALBERT R. LIMBERG
3667 Voltaire Street
San Diego, CA 92106
Telephone: (619) 344-8667
Facsimile: (619) 344-8657
alimberg@limberglawoffice.com

*Attorneys for Plaintiff*
*Pro hac vice applications forthcoming*